UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MEDICOMP, INC.,

    Plaintiff,

v.                                                      Case No:   6:18-cv-1515-Orl-40TBS

ABOUND SYSTEMS, LLC,

    Defendant.

## REPORT AND RECOMMENDATION

Pending before the Court is Plaintiff's Motion for Final Default Judgment (Doc. 21). No opposition brief has been filed. Upon due consideration, I respectfully recommend that the motion be **granted in part and otherwise denied.**

### Background

Plaintiff, Medicomp, Inc. ("Medicomp"), sued "Abound Systems, Inc., a North Carolina Profit Corporation" (Doc. 1). The Court dismissed the complaint without prejudice for failure to adequately allege a basis for the assertion of diversity jurisdiction (Doc. 5). Following dismissal, Plaintiff filed its amended complaint, again styled: "Medicomp, Inc., a Florida Profit Corporation, v. Abound Systems, Inc., a North Carolina Profit Corporation" (Doc. 6). Contrary to the case style, the amended pleading alleged that Plaintiff "sues Defendant, Abound Systems, LLC," a Texas limited liability company (Doc. 6 at 1). And, the prayer for relief sought judgment against Abound Systems, Inc. (Doc. 6 at 14, and 15). Medicomp purported to serve a summons on "Abound Systems, Inc." in Texas and, following no response, moved for entry of clerk's default (Docs. 8, 10).

That motion was denied, as the Court "[could not] tell who the Defendant is, let alone whether it was properly served." (Doc. 11 at 2).

Medicomp's motion for leave to file a second amended complaint and to amend the case caption was granted (Docs. 12, 13) and the operative complaint against Defendant, "Abound Systems, LLC, a Texas limited liability company" ("Abound") was filed (Doc. 14). Following appropriate service and no response to the second amended complaint, Medicomp obtained a clerk's default on December 6, 2018 (Doc. 19). On January 14, 2019, the Court issued an Order to Show Cause why this case should not be dismissed for failure to promptly seek a default judgment (Doc. 20). This motion, accompanied by the Declaration of Anthony "Tony" Balda, CEO and custodian of records for Medicomp (Doc. 21-2), followed. The motion was served on Abound (Doc. 21 at 6), and the time for response has expired.

## Discussion

<u>Legal Standard</u>

A district court may enter a default judgment against a properly served defendant who fails to defend or otherwise appear pursuant to Federal Rule of Civil Procedure 55(b)(2). In defaulting, a defendant "admit[s] the plaintiff's well-pleaded allegations of fact" for purposes of liability. <u>Buchanan v. Bowman</u>, 820 F.2d 359, 361 (11th Cir.1987). Nonetheless, the court may enter a default judgment only if the factual allegations of the complaint, which are assumed to be true, provide a sufficient legal basis for entry of a default judgment. <u>Nishimatsu Constr. Co. v. Houston Nat'l Bank,</u> 515 F.2d 1200, 1206 (5th Cir. 1975) ("The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law. In short, despite occasional statements to the contrary, a

default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover").

The United States Supreme Court has noted the difference between well-pleaded facts and conclusory allegations. In Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), our Supreme Court explained that a complaint need not contain detailed factual allegations, but it demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. at 678 (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the plaintiff is entitled to relief.'" Id. at 679 (quoting FED. R. CIV. P. 8(a)(2)). This analysis is equally applicable to a motion for default judgment. See De Lotta v. Dezenzo's Italian Restaurant, Inc., No. 6:08-cv-2033-Orl-22KRS, 2009 WL 4349806, *5 (M.D. Fla. November 24, 2009).

Once liability is established, the Court turns to the terms of the judgment. Pursuant to Federal Rule of Civil Procedure 54(c), "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." If unspecified monetary damages are sought, the party moving for default judgment has the burden to prove the unliquidated sums in a hearing on damages or otherwise. FED. R. CIV. P. 55(b)(1)-(2). Pursuant to Rule 55(b)(2), the Court "may conduct hearings or make referrals-preserving any federal statutory right to a jury trial-when, to enter or effectuate judgment, it needs to: A) conduct an accounting; B) determine the amount of damages; C) establish the truth of any allegation by evidence; or D) investigate any other matter." So, in order to enter a

default judgment, the Court must find that an adequate showing has been made as to liability and the kind or amount of damages or other relief.

The Allegations of the Complaint

Medicomp sues Abound in two counts, alleging breach of two different but related software contracts.

*The Rewrite Project*

On July 28, 2017, Medicomp and Abound entered into the "Android Rewrite Statement of Work for Medicomp" (the "Rewrite Agreement") (Doc. 14, ¶ 7, Doc. 14-1). Section 1.2 of the Rewrite Agreement states that the purpose of the Rewrite Agreement was to "[c]omplete the new Medicomp Android application as per the requirements of Medicomp", including "complete the backlog list (57 tasks) provided by Medicomp", "[a] minimum of 3 QADev cycles are needed before the final release", and "[i]nclude QA before all releases to Medicomp", with several "key areas of focus" also identified in the Rewrite Agreement (collectively, the "Rewrite Project", a/k/a PO 2408) (Id., ¶ 8). Section 2.2 of the Rewrite Agreement defines the "deliverables" Abound promised to deliver to Medicomp. Section 1.1 of the Rewrite Agreement provides that before Medicomp hired Abound, Medicomp had already completed a minimum of 50% of the Rewrite Project. Abound's task was to complete the Rewrite Project and build the product "for the new generation Android devices to be provided by Abound." Section 3.1 of the Rewrite Agreement required Abound to "[c]omplete coding/dev[elopment] of backlog items" within four (4) weeks of executing the Rewrite Agreement (Id., ¶¶ 9-11).

By August 28, 2017, Medicomp had paid Abound $109,012 (the "Rewrite Payment"), which was the entire sum due from Medicomp to Abound for the Rewrite Project. Medicomp alleges:

> Unfortunately, **by then, Abound had already defaulted under the Rewrite Agreement** by failing to meet two milestones under the Rewrite Agreement. Based on these failures, which showed that Abound had fallen behind on each step of the Rewrite Project, Medicomp determined that Abound would be unable to timely complete the Rewrite Project by delivering the deliverables by the Rewrite Agreement.

(Id., ¶ 12, emphasis added).

On October 9, 2017, Abound again defaulted on the Rewrite Agreement by failing to meet the new deadline to deliver the deliverables for the Rewrite Project. Despite its repeated defaults, Abound continued to claim that it could perform under the Rewrite Agreement. On November 11, 2017, Abound defaulted yet again by failing to deliver functional software, specifically by having 102 open items. The Rewrite Agreement required Abound to complete the Rewrite Project without using Medicomp's internal resources; indeed, this was a material inducement for Medicomp to enter into the Rewrite Agreement, as Medicomp did not want to incur the burden, expense, and disruption of using Medicomp's employees and technical assets for the Rewrite Project. By outsourcing the work, Medicomp's employees could continue to work on other projects for which they were better suited. Abound's "demonstrated ineffectiveness and incompetence forced Medicomp to devote significant internal resources, including employee time, to the Rewrite Project." (Id., ¶¶ 13-15).

Abound never delivered the functional deliverables required by the Rewrite Agreement (Id., ¶17). The Rewrite Agreement provides: "Abound Systems guarantees the final delivery will satisfy Medicomp. In case the product delivered is not up to the standard—as per the Statement of Work, Abound Systems will refund the *full* project cost to Medicomp." (emphasis original) (Id., ¶ 18).

Medicomp was not satisfied with Abound's final delivery, "which Abound never delivered." Medicomp demanded that Abound refund the full project cost but Abound failed to do so. (Id., ¶ 19). Medicomp did not terminate the Rewrite Agreement or excuse Abound from its obligations under the Rewrite Agreement, because Medicomp had already paid Abound in full (Id., ¶ 20).

*The Legacy Project*

Once Medicomp determined that Abound was unable to perform the Rewrite Agreement, "Medicomp attempted to mitigate its damages by redirecting Abound from the Rewrite Project to a stopgap measure, the Legacy Development Project (the "Legacy Project"), a much smaller project which was only necessary because of Abound's failure to deliver the Rewrite Agreement's deliverables." (Id., ¶ 21).

After Abound had already completed work on the Legacy Project it sent Medicomp a document titled "Android Legacy App Statement of Work for Medicomp" (the "Legacy Proposal") (Id., ¶ 22, Doc. 14-2). Medicomp never executed the Legacy Proposal. Ultimately, Medicomp and Abound agreed that Abound was entitled to a credit for its work on the Legacy Project, the amount of which was later stated in the Legacy Proposal to be $16,680. The parties agreed that Abound would receive credit of $16,680 against the $109,012 Abound owed Medicomp for its failure to perform as required by the Rewrite Agreement. Abound further agreed that Medicomp would not pay Abound any additional money unless and until Abound completed both the Legacy Project and the Rewrite Project (Id., ¶ 23).

On September 15, 2017, Abound completed the stopgap Legacy Project. After Abound completed the Legacy Project it went back to working on the Rewrite Project, with a new delivery date of October 9, 2017, and also began a new project, the

MDM Project (Id., ¶¶ 24, 25).[1]

### The MDM Project

Medicomp delivers certain services to patients by sending the patients a modified smartphone device which comes pre-loaded with Medicomp's proprietary software. Once the patients no longer need the devices, they are required to return them to Medicomp. Medicomp then reuses the devices by sending them to other patients. (Id., ¶26). Without disabling software, the devices have value to patients as smartphones, and because of this, hundreds of patients each month do not return the devices to Medicomp, creating a significant loss for Medicomp. Medicomp desired an effective MDM system because a properly-functioning MDM system renders a device almost valueless to patients for use as a conventional smartphone, thereby eliminating the main reason patients did not return the devices to Medicomp (Id., ¶¶ 28-30).

Medicomp forecasted and budgeted that it would save significant money and significantly increase revenue if Abound delivered a functional MDM system as promised (Id., ¶27). In addition to decreasing the ongoing losses from unreturned devices, Medicomp intended to derive profits from the MDM System because the improved customer experience and patient experience of the MDM System would lead to additional sales. Medicomp forecasted annual profits from the MDM System would be significant and would increase each year during the MDM System's lifespan. (Id., ¶ 40). These anticipated savings and revenues were a reason Medicomp made the business decision to pay Abound $268,000 for the MDM System (Id., ¶ 38).

---

[1] "MDM" stands for a "mobile device management" system.

On October 3, 2017, Abound emailed Medicomp delivery dates for the versions of the MDM System which Abound told Medicomp it could deliver (Id., ¶ 34; Docs. 21-3 and 21-4). Based in part on the delivery dates promised by Abound, on November 7, 2017, Medicomp executed the "Android MDM/EMM" contract (collectively with the October 3, 2017 email, the "MDM Agreement" a/k/a PO 2489) (Id., ¶ 35; Doc. 14-5).

Medicomp asserts that time was of the essence and Abound had full knowledge that Medicomp's immediate purpose in hiring Abound to develop the MDM System was to reduce Medicomp's ongoing losses from the unreturned devices. Abound also knew that the MDM System was expected to derive profits within a year (or less) of the MDM System's delivery. (Id., ¶¶ 39, 43).

The MDM Agreement provides that Medicomp would make a "one time setup/implementation cost" payment of $88,000 for the MDM System, plus monthly payments of $5,000 for license and maintenance fees from November 1, 2017 to October 31, 2020. Despite Abound's failure to perform under the MDM Agreement, Medicomp made the following MDM payments to Abound, totaling $113,000 (collectively, the "MDM Payments"):

    a. $93,000 on November 16, 2017 ($88,000 for MDM System, $5,000 for maintenance)

    b. $5,000 on November 28, 2017

    c. $10,000 on February 8, 2018

    d. $5,000 on February 28, 2018

(Id., ¶¶ 43, 44). Medicomp stopped making maintenance payments to Abound after March 1, 2018 because Abound had failed to deliver any version of a functional MDM software solution which Abound had promised to deliver to Medicomp (Id., ¶ 46).

Abound was required to deliver its off-the-shelf MDM System immediately upon execution of the MDM Agreement and deliver version 1 of Abound's customized MDM System within four (4) weeks of execution of the MDM Agreement, by December 4, 2017. Several months after the December 4, 2017 deadline, Abound still had not delivered a completed, functional, or satisfactory MDM System, and the MDM software Abound had delivered to Medicomp contained serious errors which Abound was unable to correct. During a March 19, 2018 phone call between Abound and Medicomp, Abound admitted that it was incapable of delivering the MDM System as promised. In another phone call on April 12, 2018 Abound again admitted that it had not delivered the Rewrite Agreement and MDM Agreement deliverables and said that it could "never get this done within the timeline [Medicomp] needed." (Id., ¶¶ 47-49).

The Rewrite Payment ($109,012) and the MDM Payments ($113,000) combined total $222,000. After deducting the $16,680 for the Legacy Project work, Medicomp alleges that Abound owes it $205,320 in unearned funds Abound received from Medicomp. After terminating the MDM Agreement, Medicomp asked Abound to refund the money Medicomp had paid to Abound under the MDM Agreement. On June 18, 2018, Mr. Pokala, on behalf of Abound, emailed Medicomp to confirm that Medicomp would receive "a check for the refund by August 15th [2018]" for the MDM Agreement payments. (Id., ¶¶ 51, 55-57; Doc. 14-6). This payment was not made (Doc. 14, ¶ 69).

Now, Medicomp seeks unspecified "general and special damages in an amount to be determined at trial" as well as pre-judgment interest and costs of suit, for breach of the Rewrite Agreement (Count I) and breach of the MDM Agreement (Count II).

Liability

In diversity cases such as this, "the Court applies the substantive law of the forum,

Florida, including Florida's choice of law rules." Kelley v. Nat'l Union Ins. Co. of Pittsburgh, PA, No. 8:11-CV-613-T-24 AEP, 2012 WL 1934417, at *5 (M.D. Fla. May 29, 2012). For contract actions, Florida applies the *lex loci contractus* doctrine and "applies the law of the state in which the contract was made." Hill v. State Farm Ins. Co., 181 F. Supp. 3d 980, 986 (M.D. Fla. 2016) quoting Kelley. The MDM Agreement provides that it "shall be governed by the laws of the State of Florida, without regard to conflict of laws rules." (Doc. 14, ¶ 5). There is no similar provision in the Rewrite Agreement, and no information as to the state in which the contract was made. In view of the MDM provision and absent evidence or argument to the contrary, I find the substantive laws of Florida govern this action as to both agreements.

The elements of a breach of contract action under Florida law are: (1) a valid contract; (2) a material breach; and (3) damages. Beck v. Lazard Freres & Co., LLC, 175 F.3d 913, 914 (11th Cir. 1999) (citing Abruzzo v. Haller, 603 So. 2d 1338, 1340 (Fla. 1st DCA 1992). The detailed allegations above, taken as true by virtue of the default, provide a basis for finding that Abound breached the Rewrite Agreement and the MDM Agreement by failing to provide the services contracted for.

Damages

Medicomp seeks "actual" damages in the amount of $205,332, which includes the amounts paid by Medicomp under the Rewrite Agreement and MDM Agreement and gives Abound credit for the work it did on the Legacy Project, and also seeks to recover lost profits and labor costs associated with the "incomplete, undelivered, and bug-ridden Rewrite Project and MDM System," in the amount of $4,640,434. While I find Medicomp is entitled to recover monies paid under the agreements, I do not find a sufficient basis to award lost profits or any other special damage.

*The Rewrite Agreement*

> Under both applicable case law and the Florida Uniform Commercial Code, contracts may limit damages recoverable for breach of contract, and if such provisions are made, greater compensatory damages may not be awarded. §§ 672.718[2], 672.719, Fla.Stat. (1985); Lafayette Stabilizer Repair, Inc. v. Machinery Wholesalers Corporation, 750 F.2d 1290 (5th Cir.1985); Hi Neighbor Enterprises, Inc. v. Burroughs Corporation, 492 F.Supp. 823 (N.D.Fla.1980).

Action Orthopedics, Inc. v. Techmedica, Inc., 759 F. Supp. 1566, 1569 (M.D. Fla. 1991). See also Amoco Oil Co. v. Gomez, 125 F. Supp. 2d 492, 511 (S.D. Fla. 2000) ("Florida courts allow parties to limit remedies contractually, and if such provisions are made, a court may not award greater compensatory damages."). Here, the Rewrite Agreement provides:

> Abound Systems guarantees the final delivery will satisfy Medicomp. In case the product delivered is not up to the standard-as per the Statement of Work, Abound Systems will refund the *full* project cost to Medicomp.

(Doc. 14-1, ¶ 6). "Refund" is commonly understood to mean to repay or restore; to return money had by one party of another. See https://thelawdictionary.org/refund/. This provision provides for *refund* of the full *cost* of the project, further establishing that, in the event of breach, Medicomp's remedy is to recover all the funds it paid Abound. There is no mention of lost profits, penalties or other additional recoveries if Abound defaulted. Indeed, following the default, Medicomp demanded a "*refund*" (Doc. 14, ¶ 20); not millions of dollars in lost profits or special damages. The parties explicitly agreed that the measure

---

[2] This section reads:

(1) Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

§ 672.718, Fla.Stat. Ann. (1997).

of damages for Abound's breach would be the refund (pay back) of the full costs (amount of monies paid by Medicomp to Abound for the project). Having agreed to limit its remedies and having affirmed its election, I see no basis for Medicomp to recover all it paid *and* an additional claim for lost profits.

Medicomp has alleged that it paid Abound $109,012 for the Rewrite Project (Doc. 14, ¶ 12). It also alleges that the parties agreed to credit the amount of $16,680 against that amount. (Doc. 14, ¶ 23). Pursuant to the default, I find that Medicomp is entitled to a default judgment in the principal amount of $92,332.00, for the breach of the Rewrite Agreement, plus pre-judgment interest (see below).

*The MDM Agreement*

According to Medicomp's uncontroverted allegations it made $113,000 in payments for the MDM Project (Id., ¶¶ 43, 44). Unlike the Rewrite Agreement, the MDM Agreement does not limit the remedies for breach. Medicomp alleges that after terminating the MDM Agreement, "Medicomp asked Abound to refund the unearned money Medicomp paid to Abound under the MDM Agreement" and Abound agreed to do so (Id., ¶¶ 55-57). The copies of emails attached to the complaint show that George Koos with Medicomp informed Srinivas Pokala of Abound that he "spoke with Tony[3] and was able to get him to wait" for the refund, "but he needs the refund on or before the 15th [and] indicated that if it goes beyond that point he will be forced to seek legal action." (Doc. 14-6). Under Florida law, where the buyer rightfully revokes acceptance of non-conforming goods, the buyer is entitled to the return of the purchase price that has been paid. Armadillo Distribution Enterprises, Inc. v. Hai Yun Musical Instruments Manufacture Co.

---

[3] Believed to be Tony Balda, CEO of Medicomp.

Ltd., 142 F. Supp. 3d 1245, 1255 (M.D. Fla. 2015) (collecting cases). Medicomp has established that it is entitled to a refund of the $113,000 in payments it made on the MDM Project, as the parties agreed, with pre-judgment interest.

In its briefing, Medicomp also seeks:

| Lost Profits from Unrealized Cost Savings over a 5-year life of MDM Software | $3,874,217.00 |
| --- | --- |
| Medicomp's Internal Costs to Complete MDM Software | $130,673.00 |

Medicomp's briefing is particularly scant concerning its entitlement to what it terms "special" damages. It argues (in full):

> • Special Damages: Land Title of Central Fla., LLC v. Jimenez, 946 So. 2d 90, 93 (Fla. 5th DCA 2006) ("Special damages are those that do not necessarily result from the wrong or breach of contract complained of, or which the law does not imply as a result of that injury, even though they might naturally and proximately result from the injury. More succinctly, special damages are damages that do not follow by implication of law merely upon proof of the breach.") (citations omitted); see also Fla. E. Coast Railway Co. v. Peters, 83 So. 559, 563 (Fla. 1919) ("If the owner of the goods would charge the carrier with any special damages, he must have communicated to the carrier all the facts and circumstances of the case which do not ordinarily attend the carriage or the particular character and value of the property carried, for otherwise such peculiar circumstances cannot be contemplated by the carrier.") (citation omitted).

(Doc. 21 at 3-4). Land Title was a negligence action with no claim for lost profits. Fla. East Coast Railway was an action for damages for tomatoes lost in packing houses and fields because of negligence in delaying the transportation of crates, and it was held that the measure of damages was the value of the tomatoes at the time and place they were lost. I do not find either of these citations to be relevant to this breach of contract action. Medicomp bears the burden of proving its entitlement to lost profits. Montage Group, Ltd. v. Athle-Tech Computer Sys., Inc., 889 So. 2d 180, 195 (Fla. 2d DCA 2004) (citing

- 13 -

Physicians Reference Lab., Inc. v. Daniel Seckinger, M.D. & Assocs., P.A., 501 So.2d 107, 109 n. 1 (Fla. 3d DCA 1987). As Medicomp has failed to support its claim for lost profits with adequate argument or citation to relevant authority, this alone is reason to deny the motion with respect to this element of damages. On the merits:

> It is settled under Florida law that lost profit damages, like all damages, cannot be speculative and must be proved with reasonable certainty. See, e.g., W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd., 545 So.2d 1348, 1350-51 (Fla.1989); Twyman v. Roell, 123 Fla. 2, 166 So. 215, 218 (1936). And since proving lost profits invariably includes some element of prediction about how the market would have behaved but for the defendant's tortious act or breach, Florida courts have often noted that proving lost profits damages is difficult, but by no means impossible. See, e.g., W.W. Gay, 545 So.2d at 1350-51; Twyman, 166 So. at 217-18; Aldon Indus., Inc. v. Don Myers & Assocs., Inc., 517 F.2d 188, 191 (5th Cir.1975).

Nebula Glass Intern., Inc. v. Reichhold, Inc., 454 F.3d 1203, 1213 (11th Cir. 2006). Lost profits must be proven to "be a natural consequence of the wrong." Sihle Ins. Group, Inc. v. Right Way Hauling, Inc., 845 So. 2d 998, 1001 (Fla. 5th DCA 2003), citing Brevard County Fair Ass'n, Inc. v. Cocoa Expo, Inc., 832 So.2d 147 (Fla. 5th DCA 2002); Forest's Mens Shop v. Schmidt, 536 So.2d 334, 336 (Fla. 4th DCA 1988). "The party must prove that 1) the defendant's action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined." W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd., 545 So. 2d 1348, 1351 (Fla. 1989). To permit recovery for lost profits, "the district court must consider whether (1) the seller's breach naturally caused (2) the buyer to suffer damages arising from the buyer's general or particular needs that (3) the seller had reason to know of at the time of contracting, and (4) those damages can be proven to a reasonable certainty, but (5) the buyer could not have

prevented them by cover or otherwise." HGI Assocs. v. Wetmore Printing Co., 427 F.3d 867, 879 (11th Cir. 2005).

The only proof of the millions of dollars sought for lost profits is the averments in and attachments to the Declaration of Anthony "Tony" Balda (Doc. 21-1). This declaration consists of his projections and assumptions, unsupported by expert testimony or any independent evidence of the relevant market. This largely conclusory and self-serving declaration is not sufficient to prove the damages sought to a reasonable certainty, as required under Florida law. See Halliburton Co. v. Eastern Cement Corp., 672 So.2d 844, 846-847 (Fla. 4th DCA 1996) (lost profits too speculative where "[a]ll that was offered was a hope of commercial fortune hanging from a thin thread of 'what-ifs'—buoyed by the buyer's after-the-fact testimonial conviction that success and profits would surely have been there for the taking"); North Dade Community Development Corp. v. Dinner's Place, 827 So.2d 352, 353 (Fla. 3d DCA 2002) (lost profits too speculative when "the one page of projected earnings in the prospectus was little more than an unsupported wish list of what the lessee hoped would occur in the coming years;" evidence insufficient "to satisfy the mind of a prudent, impartial person as to the amount of profits lost as a result of the lessor's breach."); Florida Sunrise, Ltd. v. Tri-M Investments of S. Florida, Inc., 942 So. 2d 421, 424 (Fla. 4th DCA 2006), decision clarified on reh'g (Dec. 15, 2006) (an unsupported wish list or hope of a commercial fortune is not enough to establish lost profits). Too, there is no showing that Medicomp could not have prevented this loss, by cover or otherwise.[4] On this record,[5] Medicomp has not established entitlement to lost profits or

---

[4] Medicomp asserts that it is entitled to $130,673 as the "cost to complete MDM Software" incurred in March 2018 (Doc. 21 at 5). So, it appears that the MDM Project has in fact been completed. As such, to the extent the software is available for incorporation into the smartphone device, it appears that these anticipated profits are not, in fact, "lost."

[5] Medicomp requests entry of judgment "without an evidentiary hearing," although, "if the Court

the amount of same.

As to the costs of completion amounts, Medicomp seeks recovery of $130,673.00 in "internal costs" described as the cost of labor it was "forced" to incur from August 2017 to March 2018. A chart attached to the Declaration of Mr. Balda purports to set forth monthly expenditures in engineering support, project management, test support and provisioning costs (Doc. 21-1 at 14). According to the allegations, "Medicomp was forced to dedicate significant *internal resources* to correcting the errors in Abound's work, assisting and supervising Abound's workers, and testing the software Abound delivered." (Doc. 14, ¶ 54). Medicomp has not made a sufficient showing of its entitlement to these costs or establishing this amount.

Medicomp is trying to recover 1) a refund of all monies paid under the MDM Agreement; 2) monies for the use of its own employees to supervise and otherwise complete the MDM Project; and 3) lost profits it would have received if Abound would have done the work Medicomp eventually did. Were Medicomp to recover all these damages, it would not be put in the same position as if Abound had performed; it would be in a much, much better position. Medicomp cites no authority for such relief. And, even assuming entitlement to completion expenses, there is no showing that the use of Medicomp's own employees "cost" the company any more than it was obligated to otherwise pay in salary. That is, presumably its employees are paid to perform the tasks assigned by the company and the fact that the company assigned this task as opposed to

---

determines that Medicomp's monetary damages are not liquidated," then Medicomp requests that the Court enter a final default judgment as to liability against Abound and schedule an evidentiary hearing or trial as to the amount of damages to be awarded (Doc. 21 at 5). While I find the actual damages to be liquidated, the issue as to the special damages is entitlement, as well as amount. Absent an adequate showing that Medicomp is entitled to these damages, a hearing as to the amount is not necessary.

- 16 -

another task does not mean that Medicomp incurred a cost.[6] Also lacking is the necessary showing as to the amount charged for labor. Medicomp is not entitled to recover average rates charged by engineers; it can recover only what it actually lost. I find Medicomp's showing inadequate to support an award of any completion damages.

Prejudgment Interest

A prevailing party is entitled, under Florida law, to prejudgment interest. See SEB S.A. v. Sunbeam Corp., 476 F. 3d 1317, 1321 (11th Cir. 2007); citing Argonaut Ins. Co. v. May Plumbing Co., 474 So. 2d 212, 214-15 (Fla.1985). As the parties agreed that a refund was to be paid by August 15, 2018, and Medicomp has put forth a rate of 6% interest (which is not contested), prejudgment interest is calculated at that rate on the total sum of $205,332.00 ($92,332.00 plus $113,000) from August 15, 2018, to the date of judgment. I have calculated the interest through February 6, 2019 to be $5,940.00 with additional interest accruing thereafter at the rate of $33.75 per day until judgment is entered.

## Recommendation

Upon consideration of the foregoing, I respectfully recommend that:

(1) The motion be **granted in part and otherwise denied.**

(2) The Court enter a default final judgment for Medicomp and against Abound in the amount of $205,332.00 plus prejudgment interest at the rate of 6% from August 15, 2018 until entry of judgment.

(3) The Court decline to enter judgment for lost profits or completion damages.

---

[6] Compare, for example, if the company had hired another firm to complete the work and incurred a contractual obligation to pay for those discrete services.

### Notice to Parties

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. <u>See</u> 11th Cir. R. 3-1.

**RESPECTFULLY RECOMMENDED** at Orlando, Florida on February 7, 2019.

*[signature]*
THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

    Presiding United States District Judge
    Counsel of Record
    Unrepresented Parties